UNITED STATES DISTRICT COURT
MIDDLE DISTRICT FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v. CASE NO. 3:14-cr-75-J-39PDB

DAVID MING PON

# UNITED STATES OF AMERICA'S CONSOLIDATED PRESENTENCE INVESTIGATION REPORT OBJECTIONS AND SENTENCING MEMORANDUM

The United States of America, by and through the undersigned Assistant United States Attorneys for the Middle District of Florida, respectfully submits the following memorandum in support of the government's positions regarding various guideline sentencing issues and objections. Additionally, the United States offers considerations to the Court about the appropriate sentence to be imposed in this case.

## I. Background

On September 17, 2015, a federal jury found Pon guilty of twenty substantive counts of health care fraud. In its simplest terms, trial testimony established that for more than six years, Pon engaged in an intricate and complex health care fraud scheme. Pon's scheme included two separate types of heath care fraud. Specifically, he engaged in what is commonly referred to as "billing for services not rendered," that is, billing Medicare for providing laser photocoagulation treatments to beneficiaries which were never provided. Then, in order for Pon to fraudulently bill for non-rendered treatments, he necessarily had to engage in another type of health care fraud, commonly known as "billing for unnecessary medical services." In this case, the

unnecessary medical treatments included subjecting the victim Medicare patients to repetitive, unnecessary, and often dangerous diagnostic testing. These unnecessary diagnostic tests were both non-invasive and invasive. The invasive tests included injecting fluorescent dyes into the patients' eyes, including fluorescein and/or indocyanine green dyes, which posed potential serious health risks to the patients, including possible death. In fact, each patient receiving the fluorescein and/or indocyanine green was required to sign informed consents outlining the potential deadly risks posed by the diagnostic procedures. Therefore, to accommodate his greed, Pon necessarily engaged in two separate but related frauds, one based on a lack of medically necessity which he then used as a basis to deplete Medicare for unnecessary treatments --- laser treatments which were never performed.

Government expert Dr. Thomas Friberg personally reviewed diagnostic images of almost 600 of Pon's patients that Pon diagnosed with the incurable, life-altering degenerative eye disease wet macular degeneration. In doing so, Dr. Friberg reviewed tens of thousands of retinal scans. In Dr. Friberg's own words, what he observed was "shocking." (Doc. No. 222 at 101, line 24). Without question, and to a reasonable degree of medical certainty, most patient files reviewed by Dr. Friberg disclosed no trace of wet macular degeneration. Moreover, the absence of scarification showed these patients had never received the laser photocoagulation treatments for which Pon billed Medicare. In addition to Dr. Friberg's testimony, thirteen independent medical professionals (retinal specialists,ophthalmologists, and two optometrists) testified for the United States. These "treating experts" had the

benefit of actually performing physical examinations on many of Pon's fraudulently diagnosed and treated patients. These treating experts unanimously echoed the testimony of Dr. Friberg. The United States also presented the testimony of several of Pon's fraudulently diagnosed patients. One, Edith Livek, had been diagnosed by Pon with wet macular degeneration in approximately January 2009. Miraculously, Ms. Livek had received no treatment for the disease in several years, but drove herself to court and was driving across the United States the next week to see her grandson who was soon to be deployed with the United States Navy in the Mediterranean. Since all experts agreed that an individual who suffered from wet macular degeneration and receives no treatment for even a year would become legally blind, patients like Ms. Livek are living proof that Pon was intentionally victimizing naïve and trusting seniors, often for years, to greedily bill millions of dollars to Medicare for medically unnecessary and factually never-provided medical treatments.

In addition to the shameful manner of Pon's scheme, the pool of victim vulnerable patients made his scheme possible. These patients were Medicare beneficiaries, many of whom were well into their 70s and some in their 80's. In fact, one patient, James Allen, was in his late 80's and early 90's. (The United States will play a video recording of Mr. Allen during the sentencing.) These elderly patients were from a generation that reflexively respected and, above all, trusted their physicians. Moreover, these patients, relying on Pon, believed that since they did not suffer any degradation in their sight from each alleged treatment to next, Pon was literally saving their sight. Of course, since the patients were never suffering from the disease

process initially, and since Pon really never did anything to them, they did not experience any additional loss in their visual acuity.

Although the financial loss suffered by Medicare, secondary insurance carriers, and co-pays from the patients themselves is at least $11,477,000, when determining the appropriate sentence to be imposed, justice demands that significant weight be given to the personal, psychological nightmare Pon caused to each of his wrongfully diagnosed patients when he told them they were suffering from wet macular degeneration and likely condemned to a future life without sight. Without question, if one was asked what physical sense they would fear losing most, the answer most certainly would be sight. In fact, even Pon agreed that eyesight is most important. (Trial Transcript Doc. 230, at 70, lines 2 – 8.) And that is the physical sense Pon used in his scheme, intentionally causing his patients to wrongfully believe that they were at significant risk of losing their eye sight. This act alone can be only described as despicably cruel.

## II. Loss

The applicable United States Sentencing Guidelines (USSG) section for the offense of conviction is §2B1.1. USSG. §2B1.1 provides for an increase in Pon's base offense level for any loss exceeding $6,500. USSG. §2B1.1(a) and (b)(1). The extent of increase depends on the amount of the loss. Id. The correct measure of "loss is the greater of actual loss or intended loss." USSG. §2B1.1, cmt. (n.3(A)). "Actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense." USSG. §2B1.1, cmt. (n.3(A)(I)). "Reasonably foreseeable pecuniary harm"

is "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." USSG. §2B1.1, cmt. (n.3(A)(iv)). "Intended loss" is "the pecuniary harm that was intended to result from the offense[,]" including "intended pecuniary harm that would have been impossible or unlikely to occur (e.g., . .. an insurance fraud in which the claim exceeded the insured value)." USSG. §2B1.1, cmt. (n.3(A)(ii)); see *U.S. v. Wai-Keung*, 115 F.3d 874, 877 (11th Cir. 1997)("It is not required that an intended loss be realistically possible.").

**a. Loss Calculation**

When calculating loss in a Medicare health-care-fraud case, the starting point is Medicare's billing records. When examining the billing records, three different amounts are generally at issue: (1) the claimed amount; (2) the allowed amount; and, (3) the amount paid by Medicare. The claimed amount is simply the amount of the claim submitted to Medicare by the claimant. The allowed amount is the maximum amount Medicare will allow a provider to charge, with eighty (80) percent of the claim borne by Medicare, and the remaining twenty (20) percent of the claim covered by either a supplemental insurance carrier or the patients' own funds. The paid amount is what Medicare actually pays the claimant.

In order to calculate the complete loss figures in this case, U.S. Department of Health and Human Services (HHS) Special Agent Jurs analyzed the relevant Medicare records. This analysis revealed that during the relevant time-frame of approximately 2002 through 2015, Pon billed Medicare for more than 700 unique beneficiaries who Pon diagnosed with wet macular degeneration and were allegedly

treated with laser photocoagulation. While the indictment states that the fraud loss period was the mid-2000s through 2011, the defense introduced additional victim patients and documentation that clearly extended the fraud loss period past the point of the indictment. (Trial Transcripts Doc. 231 at 125, lines 13-15; Doc. 231 at 126, lines 10-14; Doc. 229 at 9, lines 1-6; Doc. 231 at 173, lines 17-20) In fact, Pon continued to bill for the provision of laser photocoagulation for the purported treatment of wet macular degeneration until only a few months before his trial began. Although the bulk of the government's loss calculation is for the time period of approximately 2006 through late 2011 or early 2012, portions of the loss, arising from Pon's continued fraudulent treatment, occurred outside this time period.

This pool of approximately 700 victim beneficiaries resulted in more than $30 million of claims Pon submitted to the Medicare program. Out of this billed amount, a conservative $9.56 million was paid directly to Pon. This amount, however, does not include the secondary insurance payments related to the false claims—that is, the additional amounts paid by secondary insurers or borne by the victimized patients.

During the execution of federal search warrants at Pon's offices, several binders containing photocopies of personal checks from victim patients of Pon's wet macular degeneration fraud scheme were seized. These personal checks from the victim patients were paid to Pon for expenses not covered by Medicare or potential secondary insurance secured by the victim patient, such as deductibles and co-pays. Additionally, these notebooks contained photocopies of checks from secondary

insurance companies paying for the fraudulent and medically unnecessary diagnostic tests and the sham laser photocoagulation treatments.

The loss at issue in this case is a sum of three separate but related methodologies. The primary calculation is from the expert medical review performed by Dr. Thomas Friberg. This review, which took over a full year, comprised of Dr. Friberg personally reviewing all diagnostic testing images for approximately 500 of Dr. Pon's patients. The primary purpose of the review was for Dr. Friberg to determine if the patient did or did not have wet macular degeneration, and whether or not evidence on the retinal scars from laser photocoagulation existed. The review definitively established that in the vast majority of cases, the patients did not have wet macular degeneration. Dr. Friberg would also routinely make annotations of any pathologies that were evidenced on the retinal testing for the patients whose files he reviewed. Consequently, the government could rule out the existence of wet macular degeneration and any evidence of the receipt of laser photocoagulation, but could also establish some of the other diagnoses for retinal pathology used by Pon were accurate or fraudulent. This review was the basis for the majority of the loss determination. The government took those patients whose files had been reviewed by Dr. Friberg and used the fraudulent diagnosis code as the basis for calculating the loss. Only claims in which Dr. Pon used a false and fraudulent diagnosis code were counted for the loss, while any claims that did not have a false and fraudulent diagnosis code were not counted. For example, if a patient went to Dr. Pon and was charged for diagnostic tests and laser photocoagulation due to a diagnosis of wet macular degeneration, then

these claims, and only these claims, were included in the loss. If Dr. Pon charged the government for other services on the same day for the same patient, using a different diagnosis code (like using gonioscopies for assessing glaucomic pressures), then these claims were not included in the loss. Even if unrelated services occurred on the same day as the fraudulent diagnosis of wet AMD, any services not reflecting the known fraudulent diagnosis were still not included in the loss. Hence, the government was extremely conservative in the loss calculation. This portion of the loss accounts for 492 of Pon's 718 victims and represents $26,363,976 in claims to Medicare (intended loss), of which $7,270,596 was paid by Medicare to Pon (actual loss).

The second portion of the loss relates only to claims directly for the provision of laser photocoagulation for the treatment of wet macular degeneration. In the government's review following the search warrant on Pon's offices, it became apparent that Pon had two tracks for his patients. Those patients with absolutely no retinal pathology, or a clearly uncomplicated retinal pathology, were fraudulently diagnosed by Pon with wet macular degeneration, which was only "treated" with the phony laser photocoagulation. Dr. Friberg reviewed the files for most of these patients. For those patients with actual wet macular degeneration, or just more complicated retinal pathology, Dr. Pon would usually treat these people with intraocular injections of anti-vasoendothelial growth factor (VEGF) medicine, such as Avastin or Lucentis, as well as bill insurance for the provision of concomitant laser photocoagulation. While Pon testified that he achieved such miraculous results with the laser that anti-VEGF injectables were unnecessary, Pon nonetheless treated a subset of his patient

population with these very injectables in addition to using the “magic” laser treatments. In Pon’s direct and cross-examination, he testified that since he acquired the ability to perform high-speed angiography in 2004, the only laser photocoagulation he performed was the unheard-of technique of sub-threshold micropulse laser photocoagulation using an 810 nm laser against feeder vessels feeding occult wet AMD (halfway through the trial, this occult wet AMD assertion was changed to polypoidal choroidal vasculopathy), all while never leaving a telltale scar. Credible testimony from all of the government’s experts, including Dr. Friberg and the treating physicians, established that the settings Pon used with his laser would have no effect on retinal tissue, and certainly were not enough to cut a feeder vessel. Additional testimony established that the required power setting for any laser to actually have an effect on a feeder vessel would necessarily leave a scar. Furthermore, actual feeder vessel treatment was so extraordinarily difficult and rare that this technique was a nonexistent treatment modality in legitimate retinal ophthalmology. As such, since all of Pon’s laser photocoagulation from 2004 forward was a technique that was both ineffective and impossible, and was performed on people who were already receiving injectables like Avastin, unnecessary and improper. These laser treatments were laser claims, therefore, are also counted in the loss calculation. While Pon stated that he was performing this subthreshold micropulse feeder vessel technique from 2004 forward, in an effort to be overly conservative, the government only includes these procedures from January 1, 2006, through 2015. Unlike with the first loss component, which took all claims that were false based on a fraudulent diagnosis, the government only counts

claims for the provision of CPT code 67220, the code specific to laser photocoagulation of choroidal neovascularization, i.e., wet macular degeneration. Additionally, to avoid double-counting, before counting the laser claims in this relevant time period, the government removed all of the beneficiaries that Dr. Friberg reviewed. This leaves only wet AMD-related laser photocoagulation claims during a time period when Pon was using this impossible and fraudulent technique on patients not already calculated into the loss from Dr. Friberg's review. This loss component added 226 additonal victims of Pon's fraud, and additional $6,436,029 billed losses, of which Pon was paid $2,042.452.

The final, and smallest, component of the loss calculation is providing indocyanine-green angiography on the same day and in same eyes that he administered anti-VEGF injections. The indocyanine-green angiogram is a diagnostic test in which the injected dye goes further down into the choroidal layer of blood vessels so that the ophthalmologist can assess the blood vessels underneath the outer layers of retinal tissue. Pon admitted that he used this only in order to "identify the precise location of the choroidal feeder vessels that can be treated" (Pon's Rebuttal to Medicare Suspension, page 7). While the testimony and evidence at trial established that Pon's feeder vessel assertions were impossible and fraudulent, these tests are part of loss for another reason too. Trial testimony established no reason exists to perform both an ICG and a simultaneous anti-VEGF injection. (Dr. Berger, Trial Transcript Doc. 215 at 112, lines 20 – 22 and at 113, lines 1-7). One of the reasons why anti-VEGF injections are much more useful than laser photocoagulation, even

when laser photocoagulation was a more accepted treatment methodology, is that the location where the neovascularization is occurring makes no difference with anti-VEGF injections because the anti-VEGF treats all intraocular areas equally. In other words, the location of the offending vessels is irrelevant because the injection treats the entire eye, a fact known to Pon at the time that he was performing these injections. Hence, the actual treatment, and proper billing, for these patients is the anti-VEGF injection, with the administration of laser and ICG testing being a combination of fraudulent, potentially dangerous, and completely unnecessary procedures. To be conservative, the government has counted ICG tests only when the ICG was performed at the same time and on the same eye as an anti-VEGF injection. Neither the injection, nor even the ICG test that was almost invariably (and likely unnecessarily) given to the other eye at the same time were counted for this loss component. The population from which these claims were derived also did not include any patients whose files were reviewed by Dr. Friberg, to insure against double-counting. This component represents $784,000 in claims billed to the Medicare program and $251,142 of payments made by the Medicare program to Pon.

As established in paragraph b immediately below, the payments received from Medicare represents only 80% of allowed charges, with the other 20% being paid by the patient or secondary insurance. Most of Dr. Pon's patients carried secondary insurance to cover this 20% not paid by Medicare. No central repository exists for information related to the secondary insurance payments or amount collected directly from patients. Although the numbers are not as precise as the amount Medicare paid

to Pon, the government can precisely estimate the amount that should have been paid based on the Medicare payments representing 80% of the total. The amount paid by secondary insurance or by payments, totals of $1,912,838 ($9,564,190 x .20 = $1,912-838).

In summary, the loss to the Medicare program using these three components yields a total of $33,584,005 billed, (intended loss) of which Pon was paid $9,564,190 by Medicare. Adding (actual loss) 20% for secondary insurance or patient payments results in a total paid to Pon of $11,477,025.

**b. Loss Amount: Amount Allowed by Medicare (80-20)**

The “Amount Allowed by Medicare (80-20)” is one but one component of loss in this case. The defendant’s advisory guidelines range shall be based on “all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant[,]” USSG §1B1.3(a)(1)(A), and all harm that “resulted from” and “was the object of” the specified acts and omissions, USSG §1B1.3(a)(3). For offenses governed by the grouping rules, the advisory sentencing guidelines range shall be based on “all acts and omissions described in [USSG §1B1.3(a)(1)] that were part of the same course of conduct or common scheme or plan as the offense of conviction.” USSG §1B1.3(a)(2). Offenses are part of a “common scheme or plan” if they are “substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi.” USSG §1B1.3, cmt. (n.9(A)). Offenses are part of the “same course of conduct” if they are “sufficiently connected or related to each other as to warrant the conclusion that

they are part of a single episode, spree, or ongoing series of offenses." USSG §1B1.3, cmt. (n.9(B)).

Consequently, the advisory sentencing range may be based on "[c]onduct that is not formally charged or is not an element of the offense of conviction[.]" USSG §1B1.3, cmt. (backg'd.); see USSG §1B1.3, cmt. (n.3) (example in context of multiple drug transactions). "The cumulative loss produced by a common scheme or course of conduct should be used in determining the offense level, regardless of the number of counts of conviction." USSG §2B1.1, cmt. (n.18). The loss amount must, therefore, reflect relevant conduct, which includes the losses incurred not only by Medicare, but also by the supplemental insurance payments and direct payments by patients, that is, the deductibles and the twenty (20) percent co-payment. United States v. Hoffman-Vaile, 568 F.3d 1335, 1343 - 44 (11th Cir. 2009).

In Hoffman-Vaile, the Eleventh Circuit affirmed the inclusion in the loss calculation of the losses borne by Medicare, the patients, and the supplemental insurance companies because they were all victims of Dr. Hoffman-Vaile's Medicare fraud scheme. Dr. Hoffman-Vaile was a dermatologist who practiced in Florida, and submitted Medicare claims to First Coast Service Options. She performed surgical procedures involving the removal of lesions, but among other things, billed Medicare under a billing code that substantially increased her reimbursement rate, commonly called "up-coding." The Eleventh Circuit explained that:

> Dr. Hoffman-Vaile intended to receive the full amount that she billed Medicare as part of her fraud. She knew, or

> reasonably should have known, that she would be entitled to receive 80 percent of the billed amount from Medicare and the other 20 percent from either private insurance companies or patients. The losses sustained by the insurance companies and patients resulted from the fraud perpetrated on the Medicare program and are relevant conduct that may be considered by the district court when calculating the amount of loss. See U.S.S.G. §1B1.3. The private insurance companies and patients are victims of Dr. Hoffman-Vaile's fraud, and any loss that they suffered is included in the loss calculation. See Id. §2B1.1 cmt. 1.

Id. at 1344. Because the Court is directed to use the greater of the actual or intended loss, and the very definition of intended loss includes amounts that cannot or did not occur (e.g., insurance fraud in which the claim exceeded the insured value), the applicable intended loss amount is at least what Pon actually billed---to everyone.

In the instant case, Pon "knew" or "reasonably should have known[,]" see USSG §2B1.1, cmt. (n.3(A)(iv)), that, as a result of the fraudulent scheme: (1) he would be entitled to receive up to Medicare's total "allowable" amount; (2) at a minimum, he would receive 80% of the total "allowable" amount from Medicare; (3) he could receive the remaining 20% of the total "allowable" amount from the patients or their secondary insurance companies; and, (4) his ability to collect any outstanding balance would be limited only by his willingness to engage in collection efforts. The amount of paid loss should, therefore, be $11,477,025 (amount paid by Medicare plus 20% co-pay based on Medicare paid amount), as calculated above.

Based upon the evidence admitted at trial and the reasonable inferences that may be drawn from it, the Court should conclude that when the diagnostic tests were

administered, including the initial diagnostic tests, they were not medically necessary and that the claims therefore were illegitimate. Pon knew from the moment that he performed the initial examination of the patients, which occurred prior to any invasive diagnostic testing, that the patients did not suffer from wet macular degeneration. In his rebuttal to the Medicare suspension, Pon stated that a slit-lamp examination is “the threshold test for wet macular degeneration. Through the slit lamp, the physician is often but not always, able to see the back of the eye and determine, by visual inspection, if there is subretinal fluid.” Because the claims for the diagnostic tests connected with wet macular degeneration were illegitimate, the amounts billed for these diagnostic tests should be included in the intended loss. This loss amount would also include the amounts claimed by Pon for medically unnecessary office visits. All of the claims that are included in this loss carry a diagnosis of wet macular degeneration, for 492 of Pon’s 718 victims this diagnosis was proven to be false and fraudulent.

The guideline loss calculation should be based upon the amount billed by Pon for the fraudulent services, not the amount paid. (Although, the United States will provide the Court with evidence regarding the actual amount received by Pon for his fraudulent claims.) The guidelines provide specific guidance regarding using the amount billed as the intended loss amount. In the application notes to U.S.S.G. § 2B1.1, it specifically provides:

> Federal Health Care Offenses Involving Government Heath Care Programs. In a case in which the defendant is convicted of a Federal health care offense involving a Government health care program. The aggregate dollar amount of fraudulent bills submitted to the Government health care program shall

> constitute *prima facie* evidence of the amount of the intended loss, i.e., is evidence sufficient to establish the amount of the intended loss, if not rebutted.

USSG § 2B1.1 cmt. N. 3(F)(viii).

The Eleventh Circuit has found that using the amount billed to Medicare as the intended loss amount for guideline purposes is appropriate when supported by a permissible view of the evidence. *See Rodriguez De Varron*, 175 F.3d 930, 945 (11th Cir. 1999) (*en banc*) ("So long as the basis of the trial court's decision is supported by the record and does not involve a misapplication of a rule of law, we believe that it will be rare for an appellate court to conclude that the sentencing court's determination was clearly erroneous.") (emphasis in original). Here, Pon's goal was to collect as much money as possible from Medicare, secondary insurance carriers, and from the victim patients themselves. To limit the intended loss to the amount actually paid by Medicare would completely ignore the hundreds of thousands of dollars Pon collected from the secondary insurance carriers and the victim patients. As the court found in *United States v. Duran*, 620 Fed.Appx. 687, 690 - 691 (11th Cir. 2013), this Court should use the amount billed to Medicare as an estimate for the amount of loss intended by Pon. As the amount billed exceeds $30 million, a 22 offense level increase should be applied under USSG § 2B1.1(b)(1)(L).

## III. Specific Offense Characteristic: Increase for Loss to Medicare

USSG §2B1.1(b)(7)(A)(B)(iii) provides for a 4 offense level increase when the defendant was convicted of a Federal health care offense involving a Government health care program and the loss was more than $20,000,000. Medicare is a

Government health care program, and Pon was convicted of committing a Federal health care offense. As to the amount of loss, as set forth above, the intended loss to Medicare, based purely on the amount billed by Pon for medically unnecessary diagnostic tests, unnecessary office visits, and services not rendered, such as the laser photocoagulation treatments, far exceeds $20,000,000. Therefore, the specific offense characteristic mandates a 4-level increase.

## IV. <u>Specific Offense Characteristic: Increase for Number of Victims</u>

USSG §2B1.1(b)(2)(A) provides a 2 level increase when the offense involved 10 or more victims. The term "victim" means "any person who sustained any part of the actual loss determined under subsection (b)(1)" and "includes individuals, corporations, companies, associations" and other entities. USSG §2B1.1, cmt. (n.1).

As set forth above, financial victims in this case include Medicare, the supplemental insurance companies, and the hundreds of victim patients. Of course, the victim patients suffered both financial and emotional harm---financially when they paid their co-pays, and emotionally when they were falsely diagnosed with wet macular degeneration. Just counting Medicare and the numerous supplemental insurance companies in this case greatly exceeds 10 victims. Therefore, this specific offense characteristic mandates a 2-level increase.

## V. <u>Increase for Sophisticated Means</u>

USSG §2B1.1(b)(10)(C) provides for a 2 level increase when the offense involved "sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." "'Sophisticated means' means

especially complex or especially intricate offense conduct pertaining to the execution of or concealment of an offense." USSG §2B1.1, cmt. (n.9(B)

The sophisticated means enhancement applies if a defendant employed such means to commit an offense or evade detection. Id. The application defines sophisticated means as especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means. Application of the enhancement does not require offense conduct that rivals the complexity of a Hollywood thriller. *See United States v. Robinson,* 538 F.3d 605,608 (7th Cir. 2008) (no error to apply enhancement "merely because more intricate schemes can be envisioned"); *United States v. Connor,* 537 F.3d 480, 492 (5th Cir. 2008) (affirming application of the enhancement to a scheme that "was not the most sophisticated fraud"). The enhancement applies when a defendant uses multiple bank accounts, files fraudulent tax returns, and doctor's minutes of board meetings. *United States v. Garcia-Pastranan,* 584 F.3d 351, 392 (1st Cir. 2009). Here, Pon "doctored" more than 600 individual patient records with false and fraudulent diagnoses and medical information to support and conceal his fraudulent scheme. Every phony medical record Pon created served his goal of the appearance of legitimacy by creating records that all but untrained physicians would accept at face value.

The Eleventh Circuit affirmed the application of the sophisticated means enhancement in *United States v. Ghertler,* 605 F.3d 1256 (11th Cir. 2010), where the

defendant's scheme consisted of telephoning corporate executives, pretending to be someone from the general counsel's office that needed a cash transfer to resolve an urgent matter, and giving instructions for the wire transfer. *Id.* at 1260. The Eleventh Circuit noted that “aspects of Mr. Ghertler's scheme were not sophisticated and ... he sometimes made little or no effort to conceal either the fact of his fraud or his identity,” and affirmed the application of the enhancement to his scheme. *Id.* at 1267-68; *see also United States v. Evano,* 553 F.3d 109, 112-113 (1st Cir. 2009) (using fictitious identifications and submitting false insurance claims in several states were sophisticated means); *Robinson,* 538 F.3d at 607-08 (creating counterfeit checks on a personal computer constituted sophisticated means); *Connor,* 537 F.3d at 492 (enhancement applied to scheme in which the defendants used fake IDs to purchase goods and then sold the goods on eBay).

Trial testimony and evidence showed that Pon executed his heath care fraud scheme for more than ten years. Pon’s fraudulent scheme was both complex and intricate. The number of intricate steps necessary to effectuate the scheme well demonstrates that “sophisticated means” applies. For example: (1) Pon’s scheme preyed upon a population of patients who were of advanced age; (2) Pon’s scheme preyed upon the natural fear of blindness inherent in everyone; (3) Pon’s scheme necessitated his subjecting the victim patients to a multitude of sophisticated and frequently invasive diagnostic tests (FAs, OCTs, and ICGs). These tests, including the fluorescein angiography (FA) and indocyanine green angiography (ICG), necessitated each patient, on each visit, to sign an informed consent for the invasive tests which

identified the potential side effects and health risks, including death, before these medically unnecessary tests were administered to the victim patients. In fact, as set forth in Pon's own "Rebuttal to Notice of Suspension of Medicare Payments," dated February 22, 2012 (Government Trial Exhibit 792) at page 7, regarding the FA, Pon states "[t]his test, more sophisticated and expensive than slit lamp microscopy, consists of an injection of contrast medium (fluorescein dye) and subsequent photography"; (4) Pon's scheme included subjecting his victim patients to physical assaults when he utilized the Iridex 810 laser on the patients' eyes, despite setting the power too low to physically leave a scar. However, Pon's scheme literally necessitated shooting a laser into the victim patients' eyes. Fortunately, the laser setting was so low that it did not cause scaring. Pon did, however, use his scientific training, skill, and education to trick his patients into believing the laser was actually doing something; (5) Pon's scheme included his intentionally inflicting emotional distress in patients by causing them to believe they suffered from a degenerative disease process, which, in turn, caused the patients to have more faith in Pon's treatment modalities since their vision did not degrade from sham treatment to sham treatment; (6) Pon's scheme required the creation of thousands of false and fraudulent patient treatment records which were used to camouflage and conceal his fraud should Medicare inspect the patient treatment records; (7) Pon's scheme included his creation of numerous false "super-bills" used in the billing process; (8) Pon's scheme included causing staff members to electronically submit false and fraudulent bills for medically unnecessary procedures and for medical treatments (laser photocoagulation) that were never performed; (9)

when patient's asked Pon if they really needed to continue with the laser treatments, Pon used his superior education, training, knowledge and experience to falsely and fraudulently convince his patients that they would go blind if they did not continue his suggested treatment regime.

Additionally, Pon's own testimony establishes sophisticated means. For instance, Pon provided the following under oath statements: (1) "So the way we treat diseases has gotten so complex and so involved – over time it's gotten more and more sophisticated…" (Doc. 228 at 38, line 19 – 22); (2) "So this one camera is capable of doing all that. It's connected to a computer, a sophisticated computer, on the other side here." (Doc. 228 at 79, line 9 – 11); (3) "—because with careful examination and with sophisticated technology and everything I can do…" (Doc. 229 at 93, line 16 – 18); and (4) "—this is the 'better than sliced bread' type of treatment because this sophisticated type of treatment,…" (Doc. 229 at 94, line 21 – 23).

Unquestionably, Pon's scheme was sophisticated and intricate and his offense guideline range should be increased 2 offense levels pursuant to USSG §2B1.1(b)(10)(C).

**VI. <u>Increase for Vulnerable Victims</u>**

Under USSG §3A1.1(b)(1), a two level enhancement is appropriate "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim." A "vulnerable victim" is defined as a "person... who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to criminal conduct." USSG §3A1.1(b)(1), cmt 2. When a "large" number of vulnerable

victims are present, this enhancement may be further increased by two levels. USSG § 3A1.1(b)(2). “[B]oth circumstances and immutable characteristics can render a victim vulnerable for the purposes of § 3A1.1(b).” *United States v. Bradley,* 644 F.3d 1213, 1288 (11th Cir. 2011). Although an appellate court reviews a district court’s application of the vulnerable victim enhancement *de novo*, it “give[s] due deference to the district court’s determination that a victim was vulnerable, as this is a factual finding.” *United States v. Kapordelis*, 569 F.3d 1291, 1315-16 (11th Cir. 2009). Unlike the pre-1995 Guideline, the enhancement no longer requires that the defendant “targeted” the victim of the criminal activity due to vulnerablity. *United States v. Birge*, No. 15-15043, 2016 WL 399721 (11th Cir. July 26, 2016). Though no longer required, trial evidence supports a finding that Pon selected his patient victims due to their vulnerability.

In fact, Pon’s ability to continue his cruel and despicable scheme, by definition, was based on a pool of elderly patients, that is, Medicare beneficiaries who were frequently well into their 70s, 80’s, and even 90s. For instance, victim patient James Allen (a WWII combat-wounded veteran), was in his 80’s and early 90’s during his almost seven years of sham laser treatments. Many of these elderly patients were from what has been coined as “America’s greatest generation.” This generation of Pon’s victim patients reflexively respected and trusted physicians. Moreover, when abusing their trust in physicians, Pon’s use of a phony diagnosis of an incurable degenerative disease and their uniform experience of no degradation in their eyesight from each phony “treatment” to the next actually enhanced their faith in Pon’s medical abilities. Trial testimony established that the victim patients were so impressed with

Pon's feigned medical abilities that the victims actually referred more victims to Pon. Of course, since these patients were never suffering from the disease process, they naturally experienced no loss in visual acuity. Indeed, sentencing hearing testimony will establish that Pon would personally tell victim patients that they should be thanking him because he was the one saving their eyesight.

The Eleventh Circuit has held that an individual can be unusually vulnerable based upon age, physical condition or mental condition <u>or</u> one who is otherwise particularly susceptible to the criminal conduct. Specifically, regarding the "otherwise particularly susceptible" language in USSG. §3A1.1, the court has held that circumstances can render a victim of criminal activity unusually vulnerable. *United States v. Villali,* 926 F.2d 999,1000; *United States v. Jones,* 899 F.2d 1097, 1100 (11th Cir.), *cert. denied,* 498 U.S. 906, 111 S.Ct. 275, 112 L.Ed.2d 230 (1990). The depraved nature of Pon's scheme made his victim patients "unusually vulnerable." These victim seniors are the unfortunate candidates who are most susceptible to age-related wet macular degeneration. Pon is warning that they were at risk of losing their most precious sense--their eyesight, was intentional. Pon knew that these elderly patients trusted their well-credentialed physician, especially when they were seeing a specialist in the field of ophthalmology, that is, a retinal specialist. Pon lying to victim patients about going blind unless they continued his treatments made these patients unusually vulnerable and warrants the inclusion of 2 additional offense levels. Additionally, the Eleventh Circuit has noted that "[t]he adjustment would apply, for

example, in a fraud case in which the defendant marketed an ineffective cancer cure." *United States v. Davis*, 967 F.2d 516, 523 (11th Cir. 1992).

Finally, hundreds of individual victim patients exist in this case. They personally suffered financial loss by paying their co-pays to Pon, and the Eleventh Circuit has rejected the argument that patients involved in health care fraud are not victims when the government, that is, Medicare, is the primary pecuniary victim, not the patients. *See United States v. Bradley*, 644 F.3d. 1213, 1288 (11th Cir. 2011), *cert. denied*, 132 S.Ct. 2375 (2012).

**VII. <u>Increase for Large Number of Vulnerable Victims</u>**

As mentioned above, USSG §3A1.1(b)(2) provides for an additional 2 level increase when USSG. §3A1.1(b)(1) applies and the offense involved a large number of vulnerable victims. Since Pon's victim patients were vulnerable and more than 700 of these vulnerable victim patients exist, the number of vulnerable victims in this case was large mandates an additional two levels under USSG §3A1.1(b)(2).

**VIII. <u>Increase for Abuse of Trust or Use of Special Skill</u>**

USSG §3B1.3 requires an additional two-level increase if the defendant "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." USSG § 3B1.3. "The determination of whether a defendant occupied a position of trust is extremely fact sensitive." *United States v. Britt,* 388 F.3d 1369, 1372 (11th Cir. 2004). The guidelines define "positions of public or private trust" as positions characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given

considerable deference). Persons holding these positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. USSG § 3B1.3, comment. (n.1). Importantly, whether a defendant held a position of trust is determined by assessing the defendant's relationship to the crime's victim and applies when “the defendant takes advantage of the relationship to perpetrate or conceal the offense.” *United States v. Garrison,* 133 F.3d 831, 837-38 (11th Cir. 1998). As discussed above, Pon used his position as a physician, specifically as an ophthalmological specialist, to gain the trust of his victim patients and then prey upon their trust in him.

In *Garrison,* 133 F.3d at 841, the court held that the owner of a health care company who submitted falsified Medicare claims to a fiscal intermediary who then submitted those claims, after verification, to Medicare was not eligible for an abuse of trust enhancement. However, in *United States v. Liss,* 265 F.3d 1220, 1229-30 (11th Cir. 2001), the court held that a physician holds a position of trust with Medicare and abuses that position when he receives kickbacks for patient referrals, even when those referrals are medically necessary and do not involve falsified patient records or fraudulent claims. *See also Garrison,* 133 F.3d at 842 (explaining that abuse of trust enhancement in a Medicare fraud would apply to “a physician who possesses the expertise to create erroneous medical records and, consequently, fraudulent Medicare reports that are difficult to detect and to question”); *United States v. Hoogenboom,* 209 F.3d 665, 671 (7th Cir. 2000) (upholding abuse of trust enhancement for psychologist who billed Medicare for services not performed).

Pon abused his position of trust as a highly trained and state-licensed physician. Because Pon was a licensed medical professional, he was able to become a licensed Medicare provider, subject to all of the regulations applicable to Medicare providers. As a Medicare provider, Pon was required to certify that he would never knowingly submit claims to the Medicare program with reckless disregard for their truth or falsity. Despite this certification and the trust Pon held as a Medicare provider, Pon created false medical records to support the false Medicare claims he caused to be submitted for payment. By creating false medical records, Pon concealed his fraud in the event Medicare asked to examine the underlying medical files. Based upon Pon's dual role as a state licensed physician and a Medicare representative, Pon was in a position of trust with Medicare as well as a position of trust with his victim patients.

Pon may argue that applying the of abuse of trust enhancement would constitute an impermissible double counting with regards to the application of the sophisticated means enhancement. In essence, Pon could argue that the reason for applying the sophisticated means enhancement was based on the fact that he was a physician. Under the facts of this case, any such argument should fail.

USSG §3B1.3 states that "[t]his adjustment may not be employed if an abuse of trust ... is included in the *base offense level* or *specific offense characteristic.*" USSG. §3B1.3 (emphasis added). Therefore, if Pon's offense level has already been increased based upon the application of a specific offense characteristic that already took into account Pon being a physician and abusing the trust he held as a Medicare provider and as a physician to his patients, then the application of §3B1.3 would be considered

“double counting.” If, however, Pon’s offense level has not already been increased based upon Pon's abuse of trust, then this Court should apply §3B1.3.

The only specific offense characteristic which could potentially be impacted by §3B1.3, for abuse of a position of trust or use of a special skill, is the sophisticated means enhancement under §2B1.1(b)(10)(C). Certainly, one could argue that part of the sophisticated means in Pon’s scheme was based upon his training and experience as a physician. However, the sophisticated means of Pon’s scheme did not include the fact that he was a licensed Medicare provider and therefore, he abused Medicare’s trust each time he submitted a false and fraudulent claim. The sophistication of his scheme did not take into account his status as a Medicare provider, and, how this trust furthered his fraud. No other guideline enhancements take into account Pon’s status as a federally licensed Medicare provider. Accordingly, there is no impermissible double counting. *See Bracciale,* 374 F.3d at 1005-08.

In applying §3B1.3, the United States suggests that the Court not base the enhancement on both “abuse of trust” and “special skill,” but rather base the enhancement on Pon’s “abuse of trust” as a Medicare provider. The Guidelines themselves provide that "th[e] adjustment [for special skill] may not be employed if a [special skill] is included in [a] specific offense characteristic" for the offense. Thus, since specific offense characteristic §2B1.1(b)(10) (sophisticated means) arguably includes an enhancement for the same conduct that might trigger §3B1.3, it would be wise if the Court based the §3B1.3 enhancement on the special skill Pon held as a physician, which enabled him to commit his health care fraud. This suggestion

recognizes that “[i]mpermissible double counting occurs only when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines.” *United States v. Matos-Rodriguez,* 188 F.3d 1300, 1309 (11th Cir. 1999). Double counting is permissible “when (1) the Sentencing Commission intended the result, and (2) each guideline section in question concerns conceptually separate notions related to sentencing.” *United States v. Bracciale,* 374 F.3d 998, 1009 (11th Cir. 2004). “This Court presumes that, unless specifically directed otherwise, the Sentencing Commission intended that separate guidelines sections be applied cumulatively.” *Id.* The abuse of trust enhancement should be based upon Pon’s use of his status as a state-licensed physician to conceal his fraud by falsifying patient files and filing false claims with Medicare when Medicare was relying on his status as a licensed Medicare provider. Since these two enhancements take into account different parts of Pon's criminal conduct, they do not give rise to impermissible double counting. *See Echevarria,* 33 F.3d at 181 (“[T]here is nothing inherently duplicative in enhancing both for the vulnerability of the victims and an exploitation of a position of trust. These enhancements address separate concerns and may be based upon different elements of a defendant's conduct.”).

Further, during Pon’s own testimony he touted the fact that he used a special skill. Specifically, Pon stated “[w]ell, of course, it takes incredible - - it takes a high degree of skill for this particular type of laser treatment. The spot size we use, we treat

- - I usually treat an area around the - - around the feeder vessel itself, so that whole area is preconditioned." (Doc. 230 at 71, line 20 – 24).

## IX. <u>Increase for Patient Risk</u>

The "risk of harm" enhancement in Section 2B1.1(b)(12) applies whenever a defendant consciously or recklessly creates a risk of death or serious bodily injury. The key is "risk," and actual death or injury is not required. In *United States v. Snyder,* 291 F.3d 1291 (11th Cir. 2002), the defendants falsely misrepresented the results of the first in a series of clinical trials for a new skin cancer drug. 291 F.3d at 1295. The Eleventh Circuit affirmed the application of the "risk of harm" enhancement because the falsely optimistic reports induced the victims to continue participating in the trial and forego other, potentially helpful treatment. *Id.* The court held that "[t]he Guidelines ... do not require that the victim actually suffer serious bodily injury. Rather, the question is whether the defendant placed the victim at such a risk." *Id.* at 1294-95. Similarly, the Seventh Circuit affirmed the application of the enhancement when a doctor's failure to examine patients properly and secure accurate and appropriate diagnostic tests created the risk of harm, because if the patients had been suffering from serious injuries, the doctor's conduct created the risk that their injuries would have gone untreated. *United States v. Vivit,* 214 F.3d 908, 921-22 (7th Cir.).

Pon's fraudulent health fraud scheme, involved Pon knowingly and intentionally placing each victim patient at risk of death or serious bodily harm during each visit when the patient underwent chemically invasive diagnostic testing (FAs and ICG) and when each patient was treated with the laser.

**a. Diagnostic Testing**

Testimony, patient records, and billing records establish that as part of Pon's fraudulent scheme, he caused his victim patients to endure invasive diagnostic tests. In conjunction with these tests, a contrast dye was injected into the victim patients' bloodstream. In the FAs, fluorescein was injected into the patient. With the ICG, iodine was injected into the patient. Proof of the risks associated with these diagnostic tests are set forth in the consent forms that Pon required each victim patient sign during each visit when they received diagnostic tests. (Government Trial Exhibit 6, "Informed Consent for Fluorescein Angiography and/or Indocyanine Green Angiography.) Each of these "Informed Consent Forms" provides the following:

> I authorize and direct Dr. David M. Pon and/or his assistants to administer intravenous fluorescein and/or Indocyanine Green (ICG) dye to aid in the diagnosis and management of my eye condition. I also do not have any known allergy to fluorescein dye, indocyanine green dye, or iodine (if ICG will be used, ICG has a very small amount of iodine). A temporary yellow discoloration of the skin may occur following fluorescein Injection and can last from six to twelve hours. An orange-yellow discoloration of the urine may also occur over a period of a few hours to a day on (sic in original) longer following fluorescein injection. These changes do not represent problems or abnormal reactions. It is not uncommon to have minor problems such as itching, rash, nausea with occasional vomiting, or localized irritation or bruising at the injection site. These mild difficulties can be managed in most cases without permanent ill effect. If a seizure disorder is present, flashes from the camera could illicit a seizure. Extremely rare severe allergic complications are possible including but not limited to wheezing, temporary loss of consciousness, and cardiopulmonary arrest. If such an occurrence arises, medical management is available. Overall, the benefits of the fluorescein and/or ICG angiograms outweigh the rare significant risks. These studies have been recommended as part of your medical care in an attempt to help your vision.

Pon will likely argue that these harmful side effects, which include death, are rare. Although that may well be true, the risk existed for each patient on each and every day they received these unnecessary diagnostic tests. Moreover, the only reason Pon had for placing these victim patients at risk was for nothing but Pon's illicit greed. Interestingly, the last two lines in this "informed consent form" state that the benefits of the tests outweigh the risks and that the tests are part of the patients' medical care in an attempt to help their vision. In this case, both of these statements are false. The alleged benefits of these diagnostic tests necessarily could not outweigh the risks because the victim patients had no need for the tests. If Pon argues that he was not subjecting victim patients to potential death, then why did Pon require victim patients to sign the "informed consent forms?" Moreover, trial testimony established that death can and does occur from patients receiving FAs. Dr. Vogel, a retinal specialist from Virginia, testified that a patient in his practice actually died as a result of an injection of fluorescein from another doctor.

Further, one subset of victim patients exists that Pon knowingly placed at even greater increased risk of serious medical complications due to the diagnostic tests. During the trial several patient files were introduced showing patients had actual iodine alleges. In fact, the risk from the ICG dye was of enough significance to this victim patient population that Pon's staff routinely and prominently marked the patient files of those patient who had specific allergies to iodine and/or shellfish. As an example, it states on the front of a file relating to patient EZ, "Violently Allergic to Iodine." The review of this beneficiary's medical records, as with many others like her, revealed that

she never had wet AMD, nor any need for life-threatening injections of contrast dyes for the diagnostic tests.

**b. Laser Photocoagulation**

More than 700 of Pon's individual patients received numerous laser photocoagulation treatments. Although evidence established that the laser was set on such a low level that the laser would not be effective in cauterizing leaking vessels in the eye, there were risks with his "treatments." It is clear that Pon personally and intentionally subjected these patients to these unnecessary risks of injury tens of thousands of times. As with the diagnostic tests, Pon also had his victim patients sign an informed consent for laser photocoagulation. (Government Trial Exhibit 14, "Informed Consent for Laser Photocoagulation.) The "informed consent forms" state:

> I request that Dr. David Pon perform laser treatment(s) on my eye. I understand the risks, benefits of the treatment(s) and the alternative of no treatment. Hopefully, the laser treatment(s) will be of benefit. However, there are risks that are important to understand. The possibilities include but are not limited to loss of peripheral vision, decreased night vision, decreased central vision, decreased accommodation, glaucoma, cataract, corneal opacity, inflammation, pain, blurred or blind spots, possible need for subsequent treatment, total loss of vision, or loss of the eye. Fortunately, these complications are not common. I also understand that either anesthetic drops and/or anesthetic injection may be used to control ocular discomfort as part of the laser treatment(s). Furthermore, I understand that there is no guarantee as t the visual results. I have also had the opportunity to have my questions answered before treatment. I understand and accept the risks and wish to proceed with the laser treatment(s).

As with the invasive diagnostic tests, most victim patients never suffered from wet macular degeneration, there was never any need to use the laser, and never any need to subject the victim patients to serious complications, including “total loss of vision, or loss of the eye.” The testimony from the parade of retinal experts marshaled by the United States during the trial established beyond a reasonable doubt that the victim patients never had the disease process of wet macular degeneration and never needed to be subjected to any laser photocoagulation, whether it was set on a low power setting or not. Very simply, Pon’s scheme placed each of his victim patients at some risk of death or serious bodily injury and a two offense level increase is appropriate.

**X. <u>Obstruction of Justice</u>**

USSG §3C1.1 provides for a two-level increase when the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing in the case. In this case, for approximately two days, Pon testified under oath during the defendant’s case-in-chief. Based upon the jury’s verdict, during Pon’s testimony he committed perjury regarding material matters. These pejuious statements included: (1) his blanket denial that he intended to defraud Medicare in connection with his diagnosis of more than 600 patients as suffering from the degenerative eye disease wet macular degeneration: (2) his contention that the various diagnostic tests, including FAs and ICGs were medically necessary for his treatment of these fraudulently diagnosed patients; (3) his contention that his use of the Iridex 810 laser during the alleged

treatments of these patients was medically appropriate and that he was stopping leakage from vessels in the eye and treating the feeder vessels feeding the occult variant (and the polypoidal choroidal vasculopathy) of wet macular degeneration. Had the jury believed Pon's testimony, they could not have returned the guilty verdicts they did return. Therefore, by not accepting Pon's testimony, the jury found that Pon's testimony was false. By the jury's verdict, the jury necessarily found that Pon committed perjury beyond a reasonable doubt. Therefore, based on the jury's verdict, which could only be reached if the jury did not credit Pon's testimony, they found that Pon obstructed justice during the trial. Hence, based upon this fact and pursuant to USSG §3C1.1, Pon' s offense level should be increased by two levels for obstruction of justice during the trial.

**XI. *18 U.S.C. § 3553(a) Factors***

The pertinent factors the Court must consider under 18 U.S.C. § 3553(a) suggest, as like the advisory Guidelines do, that Pon be sentenced to long, substantial term of incarceration. When the Court considers the Guidelines in this case, it is noteworthy to reflect on the fact that the Guidelines are the result of the full-time empirical and analytical research by the Sentencing Commission, which has considered data from as many as 10,000 cases. *See* U.S.S.G. § 1A1.1, App. Note, Editorial Note. The collective data considered by this panel deserves strong consideration and a recognition that it embodies the experiences of many experienced jurists. Additionally, the Guidelines represent an important attempt to inject predictability and uniformity in the judicial system, so that like offenses are treated with like results. The importance of

the guidelines to the system of justice is itself an important factor for the Court to consider.

Pursuant to § 3553(a), the Court is required to consider the nature and circumstances of the offense and the history and characteristics of the defendant. This factor strongly militates towards a substantial sentence. Pon's criminal conduct was based entirely on greed. As a physician, Pon took some form of the Hippocratic Oath. Instead of using his skills for the betterment of his patients, he engaged in hundreds of thousands of acts of fraud and deception, on virtually every workday, for some six or more years. His criminal conduct affected more than six hundred individuals, almost exclusively seniors, in the most abominable way. Pon deserves nothing short of the substantial sentence the Government recommends.

Additionally, Pon's sentence must promote respect for the law. Anything other than decades in prison will discourage respect for the law, as it will send the message that stealing millions of dollars from Medicare and treating your patients in the worst possible manner richly outweighs the risk of getting caught and punished.

Congress mandates that the Court also consider the critical importance of deterrence and respect for the law. 18 U.S.C. § 3553(a)(2). Those considerations weigh strongly in favor of a lengthy sentence of imprisonment for Pon. Here, the value of the sentence, apart from providing just punishment to Pon, primarily lies in deterring those in the medical field from falsely diagnosing patients with an incurable disease so they can use the Medicare program as their personal ATM machine. Deterrence is even more important when the fraudulent conduct at issue is not only money, but also about

the health and welfare of our most vulnerable citizens. In this regard, it is vitally important to consider how easy this type of healthcare fraud is for an unscrupulous doctor, and just how much the system has to rely on the honesty and integrity of its provider participants.

In terms that calculating white collar criminals like Pon understand: the financial benefits of the type of fraud that Pon committed can be significant, and the risks of getting caught can unfortunately be quite low. Therefore, the only way to adequately deter the conduct is to make the cost of getting caught so severe that it is not worth risking. Realistically, the main way to strike this fear in the heart of prospective fraudsters like Pon is to impose substantial prison time on those who are caught and convicted. Failing to do that would send the opposite message: that it pays to engage in fraud such as this, because you are likely to get away with it, and, if you are unlucky and do get caught, the penalty compared to the benefit is still worth the risk.

Another important goal of criminal sentencing is protecting the public "from further crimes of the defendant." 18 U.S.C. 3553(a)(2). A substantial term of imprisonment will serve to deter Pon from continuing on this course.

Finally, it bears noting that Pon is a highly educated and intelligent individual. During the trial, the defense team highlighted his education, including his degrees from Stanford University (bachelor's degree), the University of California, San Francisco (Medical Degree), the University of California, Berkeley (Master of Public Health), his ophthalmology residency at the University of Chicago, and his fellowships at both Wills Eye Hospital in Philadelphia and at the Massachusetts Eye and Ear Infirmary at Harvard

Medical School. He is a highly skilled professional. In short, this is a defendant who simply lacks the excuses that so many less advantaged defendants present to the Court in so many other cases. This defendant is a person who knew better, who knew exactly what he was doing, who purposely engaged in this conduct and who, even to this day, has refused to take any responsibility whatsoever for his actions. Given the depraved nature of Pon's years of fraud, if ever a healthcare fraud defendant was deserving of being held accountable to the maximum extent for his criminal wrongdoing, Pon is that defendant.

## XII. Conclusion

Based upon the application of the guidelines as set forth above, the United States respectfully suggests the Court find Pon's guideline offense level to be as follows:

| | |
|---|---|
| Base (health care fraud carries a 10 yr. sent.)<br>§ 2B1.1(a)(2) | 6 |
| Intended Loss Amount (>25 million)<br>§ 2B1.1(b)(1)(i) | 22 |
| 10 or more Victims<br>§ 2B1.1(b)(2)(L) | 2 |
| Federal Health Care offense with a loss<br>Greater than $20 million<br>§2B1.1(b)(7)(iii) | 4 |
| Sophisticated Means:<br>§2B1.1(b)(10)(C) | 2 |
| Vulnerable Victims<br>§3A1.1(b)(1) | 2 |

| | |
|---|---|
| Large # of Vulnerable Victims<br>§3A1.1(b)(2) | 2 |
| Abuse of Trust or Use of a Special Skill:<br>§3B1.3 | 2 |
| Obstruction of Justice<br>§3C1.1 | 2 |
| **Total:** | **44** |

Pursuant to Chapter 5, Part A (comment n.2), in those rare instances where the total offense level is calculated in excess of 43, the offense level is to be treated as a level 43. Therefore, based upon an offense level of 43 and a criminal history of I, Pon's advisory guideline range is life. This advisory guideline recommendation is clear evidence of the seriousness of Pon's conduct in this case.

Pon was convicted of twenty substantive counts, which each provide for a statutory maximum term of incarceration of 10 years. Because the statutory maximum term of imprisonment on each count is less than the advisory guideline range of life imprisonment, the statutory maximum for each count becomes the advisory range for each count, i.e., 10 years on each of the twenty counts, totaling 200 years imprisonment. See *United States v. Sarras*, 575 F.3d 1191, 1208 (11th Cir. 2009) (citing USSG § 5G1.1(a)). Further, USSG § 5G1.2(d) provides that the statutory maximum sentence shall run consecutively:

> If the sentence imposed on the count carrying the highest Statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment.

USSG § 5G1.2(d). The "total punishment" under the sentencing guidelines in this case calls for life imprisonment. See USSG § 5G1.2, cmt. n.1; see also *Sarras*, 575 F.3d at 1208. Because the statutory maximum sentence is less than the total guidelines advisory term of life imprisonment, USSG § 5G1.2(d) calls fro the sentences for the multiple counts to run consecutively as the advisory guideline sentence. *Sarras*, 575 F.3d at 1209 (citation omitted). Accordingly, Pon's advisory guideline range is 200 years or 2,400 months.

Based upon the nature of Pon's fraudulent heath care scheme, including: (1) the victimization of more than 600 vulnerable seniors with false diagnoses that they suffered from a degenerative eye disease which could result in blindness; (2) victimizing these seniors for years, some for more than a decade, using his position of trust as a physician to trick the patients into returning time after time for sham treatments that would allegedly save their eyesight; (3) placing these victim patients at health risks, from the injection of contrast dyes, including death and blindness and unnecessarily using a laser on their eyes; (4) lining his pockets with more than $10 million by stealing from a Federal health care program designed to provide health benefits to our country's seniors, (5) stealing from hundreds of secondary insurance carriers and causing victim patients themselves to use their own funds (often from fixed incomes) to pay for Pon's despicable scheme of fraud, it is understandable how the guidelines would provide for a recommended life sentence. Despite that reasonable recommendation, the United States respectfully suggests that a term of imprisonment of no less than forty (40) years be imposed. This may

well end up being a life sentence for Pon, but he rightly has earned each day, month, and year of a lengthy term of incarceration.

Without question, stealing millions of dollars from Medicare it is an extremely serious crime. However, what makes this case stand out over the vast majority of heath care frauds is the nature of the scheme. Pon's conduct goes well beyond technical violations. The level of depravity Pon exhibited to fuel his own greed shows a complete lack of character and empathy for others. Pon's conduct can only be described as evil. The feelings just one senor felt when told of impending blindness should have been enough to stop Pon in his tracks. Pon was undeterred. He victimized more than 600 vulnerable seniors who trusted him. Forty years multiplied by twelve months' equals 480 months. If we consider these 480 months

of imprisonment, that would mean that Pon would serve less than one month (0.8 months) for each victimized patient. Less than one month for each patient is lenient.

Respectfully submitted,

A. LEE BENTLEY, III
United States Attorney

By *s/ Mark B. Devereaux*
MARK B. DEVEREAUX
Assistant United States Attorney
USAO No. 049
300 N. Hogan Street, Suite 700
Jacksonville, Florida 32202
Telephone: (904) 301-6300
Facsimile: (904) 301-6310
E-mail: mark.devereaux@usdoj.gov

*s/ Mac D. Heavener, III*
MAC D. HEAVENER, III
Assistant United States Attorney
Florida Bar No. 0896748
300 N. Hogan Street, Suite 700
Jacksonville, Florida 32202
Telephone: (904) 301-6300
Facsimile: (904) 301-6310
E-mail: mac.heavener@usdoj.gov

**U.S. v. PON** **Case No. 3:14-cr-75-J-39PDB**

**CERTIFICATE OF SERVICE**

I hereby certify that on September 28, 2016, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Thomas Kirsch, Esq.
Steffen N. Johnson, Esq.
J. Richard Kiefer, Esq.
L.E. Hutton, Esq.
Robert Stuart Willis, Esq.

Counselors for Pon.

*s/ Mark B. Devereaux*
MARK B. DEVEREAUX
Assistant United States Attorney

*s/ Mac D. Heavener, III*
MAC D. HEAVENER, III
Assistant United States Attorney