**UNITED STATES DISTRICT COURT**
**FOR THE**
**MIDDLE DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DAVID M. PON, M.D.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 3:14-cr-00075-BJD-PDB<br><br>Judge Brian J. Davis |

**<u>DEFENDANT DAVID M. PON'S SUBMISSION WITH RESPECT TO SENTENCING FACTORS SET FORTH IN 18 U.S.C. § 3553</u>**

# TABLE OF CONTENTS

**Page**


A. The Sentence Should Be Sufficient, But Not Greater Than Necessary To Promote The Goals Embodied In § 3553. ... 1

B. The Nature And Circumstances Of The Offense Warrant A Below-Guidelines Sentence. ... 2

1. The loss guideline overstates the seriousness of the offense. ... 3

2. The substantially overlapping specific offense characteristics overstate the seriousness of the offense. ... 5

C. Pon's History And Characteristics Warrant A Below-Guidelines Sentence. ... 5

1. Pon's upbringing ... 6

2. Pon's treatment of patients free-of-charge ... 7

3. Pon's devotion to patients ... 11

4. Pon's other charitable activities ... 14

5. Pon's age ... 16

6. Pon's lack of criminal history ... 17

D. A Below-Guidelines Sentence Would Promote Respect For The Law And Provide Just Punishment For The Offense ... 17

E. A Below-Guidelines Sentence Would Adequately Deter. ... 18

In this case, a thorough consideration of the § 3553(a) factors yields the conclusion that a below-Guidelines sentence would be the just result. First, the nature and circumstances of the offense, which apart from alleged relevant conduct involved 20 fraudulent billings for a total loss of $25,000, do not warrant the Guidelines-recommended sentence or the 40-year sentence suggested by the Government. Second, Dr. Pon's history and characteristics present an extraordinarily powerful argument for the exercise of leniency in sentencing. As explained below, over his decades-long career, Dr. Pon has helped untold numbers of patients, even when he knew he would never be paid for his work, even when it required him to work nights, weekends, and holidays, and even when other doctors said the work was hopeless. Dr. Pon's consistent commitment to providing quality medical care to his patients, even when they could not pay, began long before the conduct at issue in this case, and continued long after Medicare stopped paying. Dr. Pon has spent his life training for and honing his craft, all so that he could help people. Dr. Pon's medical license has been revoked, and as a result, the craft to which he has devoted his life and career are gone. A below-Guidelines sentence is sufficient punishment.

### A. The Sentence Should Be Sufficient, But Not Greater Than Necessary To Promote The Goals Embodied In § 3553.

The goal of sentencing is to fashion a sentence that is "sufficient, but not greater than necessary," to promote the sentencing goals established and codified by Congress. *See* 18 U.S.C. § 3553(a). In determining the appropriate sentence, the Court is required to consider "the nature and circumstances of the offense and the history and characteristics of the defendant." *Id.* § 3553(a)(1). The Court must "impose a sentence sufficient, but not greater than necessary" to address "the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or

vocational training, medical care, or other correctional treatment in the most effective manner." *Id.* § 3553(a)(2). In addition to these guiding factors, the Court must also consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *Id.* § 3553(a)(6). In assessing the § 3553 factors, the Court enjoys broad discretion to impose a sentence that varies downward from the advisory sentencing guidelines. *See Gall v. United States*, 552 U.S. 38, 51 (2007).

### B. The Nature And Circumstances Of The Offense Warrant A Below-Guidelines Sentence.

Section 3553(a)(1) directs the Court to consider the nature and circumstances of the offense when crafting an appropriate sentence. *See* 18 U.S.C. § 3553(a)(1). The Guidelines range advocated by the Government vastly overstate the seriousness of the offense.[1] This also violates the overriding command of § 3553(a)(2)(A) to impose a sentence that is not greater than necessary "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."

Pon was convicted of submitting 20 fraudulent charges to Medicare, defrauding the Government of approximately $25,000, yet on account of alleged relevant conduct that dwarfs the conduct for which Pon was convicted, the Government asserts that the Guidelines recommend a life sentence. The Government's Guidelines offense levels in this case are "are, quite literally, off the chart." *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006). The Government's Guidelines calculation rivals "level[s] normally only seen in cases involving major international narcotics traffickers, Mafia dons, and the like." *Id.*

---

[1] Until the evening of this filing, the Defendant had not received the final Presentence Investigation Report.

In a tacit acknowledgement that its Guidelines calculation overstate the seriousness of the offense, the Government requests a below-Guidelines sentence of 40 years. *See* Dkt. 248 at 39. Even then, the Government expressly acknowledges that 40 years is an effective life sentence for the 59-year-old Pon. Dkt. 248 at 39–40 (stating that 40 years "may well end up being a life sentence for Pon").

The Government's Guidelines calculation overstate the seriousness of the offense because the loss table unreasonably inflates the length of the Guidelines-recommended sentence, and because the specific offense characteristics that are typically triggered by high loss amounts unreasonably pile on Guidelines offense levels.

**1. The loss guideline overstates the seriousness of the offense.**[2]

"[T]he loss guideline is fundamentally flawed," *United States v. Corsey*, 723 F.3d 366, 377 (2d Cir. 2013), as corrected (July 24, 2013) (Underhill, J., concurring), and "a black stain on common sense," *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008). It "substantially overstates the seriousness of the offense" and thus warrants a departure under § 2B1.1, App. Note 19(C) (2010). "The loss table is but one example of the seemingly mindless acceleration of penalties for economic crimes incorporated in the current Sentencing Guidelines regime." *United States v. Faibish*, No. 12-CR-265 ENV, 2015 WL 4637013, at *2 (E.D.N.Y. Aug. 3, 2015). "[S]trict application" of the Guidelines derived from the loss table can "unfairly balloon [a defendant's] sentencing range beyond any reasonable proportion to his crimes." *Id.*

Despite its appearance of objectivity, "[t]he loss guideline . . . was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices." *Corsey*, 723 F.3d at 379 (Underhill, J., concurring). "[T]he Sentencing Guidelines,

[2] Without repeating all of the arguments made in responding to the draft Presentence Investigation Report, Pon incorporates those arguments here.

because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as . . . the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors." *Adelson*, 441 F. Supp. 2d at 509. "Key to understanding the current dysfunction of the fraud Guideline for high-loss offenders is recognition that . . . each increase in offense level has an ever-greater absolute effect on sentence length the higher one goes up the Table." Frank O. Bowman, III, C*omment on Proposed Amendments to Economic Crime Guideline, § 2B1.1*, U.S. Sent'g Comm'n 4 (Feb. 19, 2015), *available at* http://www.ussc.gov/sites/default/files/pdf/amendmentprocess/public-hearings-and-meetings/20150312/Bowman.pdf. The Government's loss amount estimate wildly inflates the length of its recommended sentence.

Additionally, the loss guideline overstates the seriousness of the offense inasmuch as the Government includes post-suspension billings in its loss amount. *See United States v. Crawford*, 407 F.3d 1174, 1182 (11th Cir. 2005). Although Medicare suspended payments to Pon in 2011—meaning that no billings post-2011 were paid or even considered for payment—the Government included billings up through 2015 in its loss amount calculations. *See* Dkt. 248 at 5, 9. Courts may depart downward "where there is no meaningful chance that the attempted crime would have succeeded to the extent indicated by the stated loss." *United States v. Crawford*, 407 F.3d 1174, 1183 (11th Cir. 2005). Here, there is no meaningful chance that the post-suspension billings would have been paid, and the government neither argues nor submits any evidence whatsoever to prove otherwise.

**2. The substantially overlapping specific offense characteristics overstate the seriousness of the offense.**

The overstatement by the Government's Guidelines calculations is compounded by the Guidelines' piling on of specific offense characteristics on top of the loss amount enhancement. *See Adelson*, 441 F. Supp. 2d at 510 (noting that specific offense characteristics in high-loss fraud cases represent "the kind of 'piling-on' of points for which the guidelines have frequently been criticized").[3] "[T]here is substantial overlap between [many of the] enhancements; the large amount of money involved in the fraud significantly triggers . . . them." *United States v. Lauersen*, 348 F.3d 329, 344 (2d Cir. 2003) (vacated post-*Booker*). "[A]n accumulation of somewhat overlapping enhancements, even if not amounting to double counting, can justify a downward departure" because they "combine to have a cumulative effect that is present 'to a degree' not adequately considered by the Commission." *United States v. Jackson*, 346 F.3d 22, 26 (2d Cir. 2003) (citing 18 U.S.C. § 3553(b)) (vacated post-*Booker*). Indeed, "in high-loss cases, judges are refusing to give effect to multiple SOCs and role adjustments even when they are found to exist and are factored into the official guideline calculation." Bowman, *Comment on Proposed Amendments to Economic Crime Guideline, § 2B1.1*, at 10.

**C. Pon's History And Characteristics Warrant A Below-Guidelines Sentence.**

Section 3553(a) directs the Court to consider a defendant's history and characteristics when deciding an appropriate sentence. *See* 18 U.S.C. § 3553(a)(1). David Pon's unique history and characteristics warrant a below-Guidelines sentence. Pon dedicated his life to being an excellent doctor, and he spent countless hours and made personal sacrifices to provide the best quality of

---

[3] In this case, the specific offense characteristics that substantially overlap with the high loss amount alleged by the Government include enhancements based on the number of victims, large number of vulnerable victims, sophisticated means, use of a special skill, abuse of trust, and a federal health care offense with a high loss amount.

care to his patients, even those who could not afford to pay. As Janet Mahindroo, who has known Pon for well over 10 years, wrote, Pon is "an eager student who was a natural teacher; a charitable spirit inside a driven achiever; and a talented surgeon combined with compassionate caregiver; but most of all, I saw and still see, someone with a clear heart who wishes others to benefit." Letter from J. Mahindroo.

**1. Pon's upbringing**

David Pon was born to two Chinese immigrants in a Hispanic neighborhood in San Francisco. Because only Cantonese was spoken at his home, Pon first learned English in kindergarten at Hawthorne Elementary School. He was an excellent student. Starting in the fourth grade, he was mandatorily bused to the gifted program at Lakeshore Elementary School. At Horace Mann Junior High as well, Pon was in the gifted program. He took all the classes he could, and eventually graduated as valedictorian. Pon learned the flute, and earned a scholarship to the San Francisco Conservatory of Music. Pon also earned admission to an all-city magnet school, Lowell High School.

Pon was the oldest of four siblings, and it was his responsibility to shepherd them from school to an after-school Chinese language program in the Mission (then a predominately immigrant neighborhood in San Francisco), and then to home. Pon's mother gave each of the children a nickel for the bus fare home, but the Pon children, under Pon's watchful eye, often walked instead because every nickel mattered to the Pon family. Letter from J. Pon. Walking home was not without peril—just a block from his home, Pon was once beaten and robbed of a bicycle for which his parents had spent a year's savings.

Pon's desire to serve others started early. At age 6, Pon began serving as a volunteer swim instructor at Garfield Pool, a few blocks from his home. Pon loved teaching others to swim and to overcome their fear of water. Pon taught more children to swim than any other instructor at the

pool, and he kept volunteering as a swim instructor through high school. In high school, Pon ultimately became an All-City swimmer. *See* J. Pon Letter.

Helping his family has always been a priority for Pon. In high school, Pon worked part time at a McDonald's for $2 an hour to save for college. Ultimately, Pon "went to San Francisco City College after high school to save on college costs." W. Pon Letter. Pon's interest in medicine arose, in part, because of undiagnosed hypothyroidism that left his younger brother disabled. This condition is easily preventable if properly diagnosed. Pon saw firsthand the devastating consequences of missing a diagnosis and poor medical care.

Pon dedicated himself to becoming an excellent doctor. He transferred to Stanford and excelled there, ultimately graduating Phi Beta Kappa and with a 3.98 GPA. Pon received a full scholarship to the medical school at the University of California, San Francisco, then ranked first in the country. He excelled there too, eventually completing his internship at Stanford, his residency at the University of Chicago, and his fellowships at Harvard University and the Willis Eye Institute. Pon worked long hours, often working 40 hours straight, sleeping for eight, and then repeating, for as much as 120 hours per week. He made little money, often the equivalent of $4 an hour given the high number of hours he worked. When Pon and his wife Ingrid moved across the country from California, they sometimes slept in their car because they could not afford a hotel. When they finally did arrive, Pon and Ingrid lived in a 400-square-foot studio in Chicago, rented a single room in Boston, and lived in a 500-square-foot studio in Philadelphia.

**2. Pon's treatment of patients free-of-charge**

Pon's medical practice was not motivated by a desire for money, but by a genuine desire to help people. Pon treated his patients without concern for whether they could pay and frequently provided treatment free-of-charge. Many of these patients wrote letters expressing their appreciation for Pon's exceptional efforts to provide free medical care.

Jerome Lewis was 26 years old, unemployed, had no health insurance, and had lost 95% of his vision in both eyes: "Dr. Pon saw me the same day I made an appointment. . . . I recovered 50% of my vision. I was able to find employment, provide for my son, and eventually get married to my beautiful wife. I was unable to afford my treatments initially yet Dr. Pon did not waver in providing the very best possible care for me in what seemed to be hopeless circumstances." Letter from J. Lewis.

Suljo Garib was an immigrant from Bosnia. Letter from S. Garib. Garib had been doing house repairs for Pon, and Pon invited him to lunch. *Id.* Garib mentioned over lunch that he had been forced to leave his mother behind in Bosnia, and that her eyes had been injured during an explosion in the Bosnian war. *Id.* When Garib's mother later came to America, Pon diagnosed her and arranged for another surgeon to treat her free-of-charge. *Id.*

Other ophthalmologists told Anuar Murrar-Garay's wife "there is nothing we can do, you are going blind." Letter from A. Murrar-Garay. Murrar-Garay, living in San Francisco, learned of Pon from a UC Berkeley alumni group and sought treatment from him for his wife. It didn't matter that Pon's services wouldn't be covered by her health insurance—Pon "wrote off the bill for his initial treatment." *Id.* Pon spent "two consecutive days" treating her, and by the end of it she could "read off a chart." *Id.* "Emotions ran high" at her miraculous improvement. *Id.*

Shunshine Lissau "could not find any doctor willing to take [her] case," and "could not afford health insurance." Letter from S. Lissau. A friend of hers "knew Dr. Pon as an honest, and charitable doctor who had helped other patients who [were] in the same situation" and Pon "spent many hours to save [her] eyes and did not ask for payment." *Id.*

Pei Zheng Wu tells the story of her 66-year-old friend, who "had no job, no money and no insurance" and "was not able to see to drive" or "to work." Letter from P. Wu. Pon "took

exceptional care of [him] by carefully examining his eyes and running tests for almost two hours" and "knowing [his] financial difficulty, [Pon] waved [sic] his fees." *Id.*

Shiow Liu woke up one day in 2006 "to find that [she] had lost part of the vision in [her] right eye." "I sought and received a referral to an ophthalmologist and was fortunate to find Dr. Pon. Despite my lack of insurance, he accepted my case . . . [and] found that I had a significant retinal detachment. [Pon] originally recommended that I be admitted to the hospital for treatment, but I was very uncomfortable and concerned about the financial burden a hospital stay would cause due to my lack of insurance. Dr. Pon took my financial dilemma into consideration and agreed to try to treat my retinal detachment in his office. He spent countless exhausting hours treatment [sic] me . . . he was relentless in trying to achieve the best possible outcome even though I had no insurance or money to pay him." Letter from S. Liu.

Brian Spalter writes, "When I was . . . still struggling with student debt and other financial obligations, Pon agreed to see and treat me at no charge after learning that I had developed sports inflicted retinal tearing. Had I not seen Pon at that time, I would have most likely neglected the injury to my eyes resulting in permanent damage to my eyes and potentially even ended up blind. . . . I feel it is something I can never repay him for." Letter from B. Spalter.

Robert Lynch, President of the Buddhist Tzu Chi Foundation writes, "We have routinely referred to Dr. Pon, for medical care, people who were uninsured and had no means to pay. Dr. Pon [w]as a wonderful and compassionate professional and has never once refused our referrals. He took care and treated every one of them with utmost perfection." Letter from R. Lynch.

Angelo Tom writes, "Dr. Pon has provided free medical treatment and consultation for my family, including my elderly parents, and has never accepted any compensation from me." Letter from A. Tom.

Many other letter-writers wrote of Pon's generosity in providing free care to patients:

- "[Pon] is a doctor with a big heart who is willing to do anything possible to save his patients' vision regardless [of] their ability to pay. . . . Knowing she has little savings and no insurance, Doctor Pon did not take in a penny from Mrs. Zou all these years." Letter from the Zheng family.

  "I did not have any medical insurance at then [sic]. He did not ask for any payment plan." Letter from J. Yan.

  "[Pon] never charged me more than he received from Medicare. I have never had a doctor do this. He knew I had a hard time paying and this was very generous of him." Letter from S. Thrasher.

  "Doctor Pon was known to even pay emergency room fees and donate surgery time to save a patient[']s eye [sight]." Letter from D. Thacker.

  "Dr. Pon is a very giving person who always researched and applied the best treatment possible for all his patients, even if they could not afford the medical costs. I am also aware of several elderly parents of friends in Orlando who did not have sufficient insurance coverage or money for treatment and Dr. Pon treated all of them with the best possible care and with no regard whatsoever on their ability to pay." Letter from H. Chu.

  "I personally referred patients in this community to see [sic] his services. Many of these patients were not able to pay. This never bothered him a bit. He told me that he took an oath to serve the sick and the needy at all costs when he became a medical student." Letter from B. Liang.

- "David has taken on many of cases knowing that the patient was not able to repay him." Letter from R. Kwong.

  "[Pon] never refused treatment to those who didn't have money or insurance. He treated many patients who were turned away by other eye specialists and cared for them pro bono." Letter from A. Tseng.

  "Many patients never paid, and Dr. Pon enver [sic] sent anyone to a bill collector in his 25 years of practice. He believed his principal mission was to help these patients without regard to his financial compensation." Letter from A. Tom.

Pon's friends and patients (many of whom became his friends) have praised him as a kind and generous man. "I have never known him to be anything but kind, gentle and generous with his patients." Letter from C. Boxberger. "So many people have benefitted by the careful, generous and professional treatment at Dr. Pon's hands." Letter from A. Tseng. "In the past 17 years I found Dr. Pon to be [a] very caring, friendly, generous and kind person to me and many others." Letter from S. Garib.

### 3. Pon's devotion to patients

Pon was devoted to providing the very best medical care for his patients. He did so without regard for whether they could pay—something not all doctors did. "David is a very giving person who always researched and applied the best treatment possible for all his patients, even if they could not afford the medical costs." Letter from H. Chu. His wife, Ingrid Lin, tells a story from when Pon first started his practice: Pon "was sharing his office with another ophthalmologist who only treated patients who had the ability to pay for their medical treatment and services. This other doctor was very unhappy that their shared waiting room would be occupied by Pon's poorer, and sometimes much sicker and in the other doctor's opinion, not very nice smelling patients. This other doctor actually admonished the staff telling them that Dr. Pon's patients could not sit next to his patients. Pon's attitude and instructions to his staff never wavered—he told them that caring for the poor and the sick is a sacred duty and that they should never let anyone tell them otherwise." Letter from H. "Ingrid" Lin. As Donna Adams put it in her letter, "Dr. Pon always took time with me and made me feel like I was valued and had worth." Letter from D. Adams.

Pon went to exceptional lengths to treat patients when they were in need, continually putting people in need first—even on nights, weekends, and holidays. He "put [his] patients first above everything—even [his] own comfort." Letter from H. "Ingrid" Lin.

- "One night I was in pain and I called his office at 8 p.m. and he was still in his office working and answered the phone himself. I thought that was very unusual for any doctor today." Letter from K. Wohlbold.

  "I have called when Doctor Pon has been in his office after hours, and he would personally answer his own office telephone and speak with me regarding my condition and treatment." Letter from C. Boxberger.

  "There are few doctors that I have had in my eighty-four years of life that are as intelligent, knowledgeable and caring about the welfare of their patients. I can't tell you how many times I had specific eye issues and had to call him and he responded, day or night, either with advice or meeting me at his office, on his time." Letter from Z. Gould.

> "[Pon] was the only doctor who would take my call on a Friday evening at 4:30PM and tell me to come to his office immediately. . . . his office in Orlando [was] a one hour drive away. He and his staff waited for me." Letter from S. Thrasher.
>
> "Many times [Pon] performed surgeries into midnights while we were waiting for him to call and pick him up at the hospitals. He would get calls for emergencies when we were eating at dinner tables [sic]." Letter from B. Liang.
>
> "[Pon] put in long hours in the office treating patients, never rushing them, doing surgeries whenever and wherever needed, and was always willing to go the extra 'two' miles for his patients." Letter from J. Mahindroo.

Dr. Pedro Toro was visiting Florida from Puerto Rico when he suffered a retinal tear. Letter from P. Toro. Dr. Toro found Pon's listing in the Yellow Pages and called him: "It was [o]n a Friday evening and he himself answered the phone. I was surprised. He offered to take care of me the next day—Saturday. . . . I was not his patient, I was not his friend, I was not referred by anybody he knew. Not many doctors are so dedicated as to do this." *Id.*

Stella Balandrian suddenly developed a bacterial infection in her left eye. She visited Pon, who immediately referred her to the hospital and treated her there: Pon "not only cared for his patients in his office all that day but was in surgery at the hospital with me at eleven that same night." Letter from S. Balandrian.

Because "he feels a tremendous responsibility to help others," Pon never scheduled vacations. Letter from A. Pon. And when he did take vacations, he frequently cancelled them or cut them short to treat patients in need.

Vic Armstrong suffered a retinal detachment while visiting Florida over Thanksgiving. Letter from V. Armstrong. It was the Friday after Thanksgiving, and while "[m]any physicians would have their offices closed," he called Pon and Pon "answered on his cell phone." *Id.* Pon was "driving in his car from Orlando to Miami," but "turned around" and "called in staff to assist." *Id.* Armstrong received "treatment within two hours of contacting" Pon. *Id.*

Sanghou Chu dropped a glass and a glass shard "flew into [his] right eye!" Letter from S. Chu. "It was 11:00 at night and there was no eye doctor at the Emergency Care. I asked my wife, who attended the same temple as Dr. Pon, if he might be willing to see me. She gave him a call.

Ten seconds later, she told me 'Let's go. He is happy to help you and he will be waiting for us.'" *Id.*

Hsingchu Chu writes, "A gentleman in Orlando suffered a torn retina on Christmas eve. Unfortunately they couldn't find a retina specialist to see him. Dr. Pon learned of this man's situation from a friend and immediately drove over an hour . . . to treat this man." Letter from H. Chu.

Akasa Tseng writes, "Around 1998, my mother experienced a serious vision loss. At the time, Dr. Pon was on vacation visiting his family in San Francisco. When he heard about my mother's eye problem, he immediately called a colleague . . . and made arrangements to see and evaluate my mother's eye problem." Letter from A. Tseng.

Pon spent long hours with his patients and worked hard to give them the best treatment and to explain their treatment to them. "He would spent [sic] hours examining his patients and treating them with utmost kindness, not a ten-minutes routine walk-through one experience[s] in other clinics." Letter from B. Liang. "He took all the time he needed to help me understand what he was doing and why." Letter from S. Thrasher.

Pon's devotion to providing the best care to his patients was recognized not just by his patients, but by other doctors as well. According to Dr. Solomon Luo, "If there is one attribute that would stand out in Dr. Pon's personality it was the care he wanted to deliver to his patients. He spent many long hours in patient care with the only motivation being that he could help another human being by enriching their life with the gift of sight. . . . Even patients who did not have the recourses for treatment would receive the best care from Dr. Pon." Letter from S. Luo. According to Dr. Roger Rath, "I always found [Pon] to be professional, congenial, humble and honest in his

dealings with me and my patients; willing to help patients in any manner, at all hours, regardless of remuneration." Letter from R. Rath.

Pon was not afraid to take on difficult cases that other doctors refused or "shrugged their shoulders and said, 'there is nothing we can do.'" Letter from A. Murrar-Garay. Kathleen Wohlbold described Pon as "God sent." Letter from K. Wohlbold. Ms. Wohlbold, who had a narrow angle glaucoma attack in both eyes, was passed along by five different doctors, but not before one of them botched the treatment and left her blind in her right eye. *Id.* Pon took her case and saved her other eye, even though her "insurance did not cover [him]." *Id.* According to Ms. Wohlbold, "[Pon's] main concern was always his patients. He is a very dedicated doctor and worked very hard to do the best he could for all of us. I saw one lady give him a hug and thank him, she was so grateful to him. He deserved a hug from me since he saved my left eye." *Id.* Pon treated Dr. Roger Rath after a previous eye surgery by a different doctor left his vision "still unexpectedly poor without obvious causation bewildering several ophthalmologists." Letter from R. Rath. Pon performed "appropriate testing, including fluorescein angiography" and "determined that one of the surgeons in New York had mistakenly inserted the wrong-powered lens implant." *Id*.

These examples are merely illustrative of an untold number of people that Pon has helped without payment or at personal sacrifice. As Dr. Pedro Toro put it, "Dr. Pon's arrival to my life was God sent. I never expected to find such an unselfish attitude towards his patients. While in the waiting room I heard many stories of his generosity with his time and dedication to his patients, like it happened to me." Letter from P. Toro.

**4. Pon's other charitable activities**

Pon was charitable, selfless, and active with his temple. Even though Pon is a highly trained professional, "he gave of his time to mundane volunteer chores selflessly, serving others

equally and tirelessly." Letter from P. Wu. As Liyuan Woerner, President of Oversea Yin Xin Vihara, relates, "After each service, the temple provides a lunch prepared by volunteers . . . Dr. Pon quietly walked behind the food stand and remained there serving food, waiting to serve himself until everyone had ha[d] at least one, and often more than one helping." Letter from L. Woerner. "He gave free lectures on how to care for your eyesight, as well as conducting free eye health screenings." *Id.* "[M]any times [Pon] brought his medical equipment to the temple during events where he would provide free eye exams" and "sample eye drops." Letter from P. Wu.

Pon was charitable not just to his patients and to fellow temple-goers, but also to many others. Luo Li is an immigrant from China and a martial arts instructor. Letter from L. Li. Li struggled to make ends meet. *Id.* Pon, who was a student in one of Li's classes, learned that Li and his wife and daughter lived in a dangerous neighborhood. *Id.* Pon encouraged him to look for a small house in a safer neighborhood, and when he did, Pon and his wife wrote "a check for the entire down payment on the day of [the] house closing." *Id.* Li writes that "[s]ince 2008, my family has lived in a beautiful and peaceful neighborhood and my daughter has thrived and excelled in the area school. Without Dr. Pon and his wife's kind hearts, it would not have been possible for us to have such a safe and happy life." *Id.* When Li and his wife were blessed with a son in 2011, they were distraught that he suffered from several medical problems. *Id.* But Pon was there to help them, and he "provided professional evaluations when required—always without requiring payment of any kind." *Id.*

Additionally, "[o]n a weekly basis, Dr. Pon donated food to the Salvation Army of Orlando and other nonprofits," and "offered his Windermere home for charitable events at no cost." Letter from A. Tom. He gave generously to disaster relief charities, and even volunteered to go to China after the Sichuan earthquake in 2008. Letter from J. Mahindroo.

Pon has long been a generous person. Roanne Tom, who has known Pon for more than 40 years, writes, "[e]ven before Dr. Pon became a doctor, he would always pick up the tab for any lunch or dinner with my family. My husband would always tell him up front that it is our turn to pick up the tab, but Dr. Pon would never accept our payment. . . . my 40 year observation of Dr. Pon would conclude his character as very kind, helpful, and generous in nature." Letter from R. Tom.

Pon continued to see and treat patients long after his Medicare billing privileges were suspended. Vijay Mahindroo writes that when he picked up Pon after he was released on bond, "David's biggest concern at that time was his patients and how badly he felt not being able to help them." Letter from V. Mahindroo. "David immediately went back to seeing his patients when released. In fact, with the ankle monitor on, his biggest concern was that he could not get to the hospital to help someone in the emergency room with a critical eye problem or injury." *Id.* "He continued to treat patients during his release even though he was not being compensated under Medicare or Medicaid. This fact right there shows [how] much he really cared—not about money—but about helping people." *Id.* Indeed, even though Medicare suspended payments to Pon in October 2011, Pon continued to see and treat patients. Letter from A. Tom.

**5. Pon's age**

Pon is 59 years old and unlikely to reoffend. *See* U.S.S.G. 5H1.1 (stating that a court may depart downward based on a defendant's age). The Guidelines "explicitly acknowledge that a defendant's age, and specifically old age, is a relevant consideration in sentencing," because "past fifty years old there is a significantly lower rate of recidivism." *United States v. Payton*, 754 F.3d 375, 379 (6th Cir. 2014) (citing United States Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* 12 (2004)). This is all the more true in this case because Pon has not previously been imprisoned. *See United States v.*

*Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001) (counseling district courts to consider previous terms of incarcerations and calibrating new sentences to reflect prior time behind bars).

**6. Pon's lack of criminal history**

Pon is a first-time offender and has no prior convictions of any kind. The Sentencing Commission has recently recognized that first-time offenders with no prior convictions should be considered for more lenient sentences. Last month, the Sentencing Commission proposed an amendment to the Guidelines that would decrease the offense level of a defendant by one or two points if the defendant had no prior convictions. *See* U.S. Sent'g Comm'n, *Proposed Amendments to the Sentencing Guidelines* at 4 (Dec. 19, 2016), *available at* http://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20161219_rf_proposed.pdf. The current Guidelines lump together in Criminal History Category 1 offenders "with varying criminal histories," including those with no prior convictions, those with stale convictions, those with convictions not otherwise counted, and those whose prior convictions produce only one criminal history point. *Id.* at 1. "Recidivism data analyzed by the Commission indicate that 'first offenders' generally pose the lowest risk of recidivism." *Id.* This suggests that defendants like Pon, with no prior convictions, do not need sentences as lengthy to further the purposes underlying sentencing.

**D. A Below-Guidelines Sentence Would Promote Respect For The Law And Provide Just Punishment For The Offense.**

Pon has suffered significant punishment for the offenses of conviction. The stress and worry that the investigation and trial have caused him have been immeasurable. Indeed, the stress may well have contributed to the transient ischemic attack Pon suffered while in custody. Pon has

lost his Medicare privileges and his medical license has been revoked.[4] He has watched the trauma that this case has caused his wife, his mother, his brother and sisters, and many of his patients. And he has not blamed the Government for his troubles: After Vijay Mahindroo picked up Pon after his being released on bond, "for the entire three-hour drive back to Orlando, David never showed any madness at the prosecutor, the government, jail guards, or any inmates." Letter from V. Mahindroo.

**E. A Below-Guidelines Sentence Would Adequately Deter.**

The goal of specific deterrence already has been met in this case. Indeed, with the stress and embarrassment of the criminal trial, the trauma suffered by those closest to him, and the loss of his medical license and ability to treat patients, there is no doubt whatsoever that Pon will not repeat the conduct that resulted in this case.

Additionally, the case already has sent a strong message of general deterrence to the community. There has been a well-publicized investigation and trial. The community is acutely aware of the substantial professional and financial penalties that have been visited upon Pon in connection with this case. It is unlikely that a lengthy prison sentence for Pon would add any discernible deterrent effect.

Defendant respectfully requests that the Court impose a below-Guidelines sentence.

Dated: January 4, 2017

Respectfully submitted,

By: /s/ Thomas Kirsch
Thomas Kirsch
WINSTON & STRAWN LLP

[4] *See* Florida Department of Health, License Verification for David M. Pon, https://appsmqa.doh.state.fl.us/MQASearchServices/HealthCareProviders/LicenseVerification?LicInd=49221&ProCde=1501.

35 West Wacker Drive
Chicago, Illinois 60601
Tel.: (312) 558-5600
Fax: (312) 558-5700
TKirsch@winston.com

J. Richard Kiefer
BINGHAM GREENEBAUM DOLL LLP
2700 Market Tower
10 West Market Street
Indianapolis, Indiana 46204
(317) 635-8900

Robert Stuart Willis
WILLIS & FEREBEE
503 East Monroe Street
Jacksonville, Florida 32202
(904) 356-0990

*Counsel for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 4, 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Mark Devereaux, Esq.

Mac D. Heavener, III, Esq.

Bonnie Ames Glober, Esq.

John L. Brownlee, Esq.

Adam Michael Blank, Esq.

/s/ Thomas Kirsch
Thomas Kirsch